UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

LORRI ZAHLER,

                                        Plaintiff,

              - versus -

EMPIRE MERCHANTS, LLC, and LIQUOR
SALESMEN'S UNION LOCAL 2-D,

                            Defendants.

---

MEMORANDUM
AND ORDER
11-CV-3163 (JG) (CLP)

APPEARANCES:

        LAW OFFICE OF STEVEN A. FELDMAN & ASSOCIATES
                763 Dogwood Avenue
                West Hempstead, NY 11552
        By:     Steven A. Feldman
                *Attorney for Plaintiff*

        KAUFF MCGUIRE & MARGOLIS LLP
                950 Third Avenue, 14th Floor
                New York, NY 10022
        By:     Michele A. Coyne
                *Attorney for Defendant Empire Merchants, LLC*

JOHN GLEESON, United States District Judge:

        Plaintiff Lorri Zahler brings this action against her former employer, Empire

Merchants, LLC ("Empire") and her former labor union, Liquor Salesmen's Union Local 2-D

("Local 2-D" or the "Union").  She alleges employment discrimination on the basis of age, sex

and nationality in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e *et seq.* (first cause of action), the New York State Executive Law § 296 *et seq.* ("New

York State Human Rights Law" or "NYSHRL") (second cause of action), the Administrative

Code of the City of New York § 8-107 *et seq.* ("New York City Human Rights Law" or

"NYCHRL") (third cause of action), the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621 *et seq.* (fourth cause of action), and the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)

(fifth cause of action); common law tort claims of Tortious Interference with Contract (sixth

cause of action), Tortious Interference with Business Relations (seventh cause of action) and

Tortious Interference with Prospective Economic Opportunity (eighth cause of action); wrongful

termination (ninth cause of action); interference (tenth cause of action) and retaliation (eleventh

cause of action) under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601,

2615(a); breach of a labor agreement, wrongful discharge in breach of a labor agreement and

breach of the Union's duty of fair representation under § 301 of the Labor Management

Relations Act ("LMRA"), 29 U.S.C. § 185(a) (twelfth and thirteenth causes of action); and

unlawful discharge with intent to deprive Zahler of pension benefits under § 510 of the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140 (fourteenth cause of

action).

   Empire moves to partially dismiss Zahler's Amended Complaint ("Complaint"),

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, seeking dismissal of the sixth,

seventh, eighth, ninth, tenth, eleventh and fourteenth causes of action for failure to state a claim.

   For the reasons that follow, Empire's motion is granted in part and denied in part.

Zahler's tortious interference claims (sixth, seventh and eighth causes of action) are hereby

dismissed for failure to state a claim.  Zahler's claim for wrongful termination (ninth cause of

action) is also dismissed, because it is preempted by § 301 of the LMRA and thus redundant with

her claim against Empire under § 301 (twelfth cause of action).  However, Empire's motion is

denied with respect to Zahler's claims for FMLA interference and retaliation (tenth and eleventh

causes of action, respectively) and ERISA § 510 (fourteenth cause of action), because I conclude

that she has alleged a plausible claim for relief on each.

## BACKGROUND

A. *Factual Allegations*[1]

      Zahler, who is 55 years old, was employed by Empire (and its predecessor

company, Charmer Industries) as a sales representative from 1994 until 2011.  Compl. ¶¶ 20-22

(ECF No. 8).  Empire distributes fine wines and spirits to bars, restaurants, and retail outlets in

the metropolitan New York City area.  As a salesperson, Zahler earned her income from

commissions and incentive pay that she received based on the accounts that she developed.  *Id.* ¶

39.

      In 2007, Charmer Industries merged with another company to form Empire.  *Id.* ¶

21.  In the lead-up to this merger, older salespersons who were nearing vestiture of their pensions

were aggressively encouraged to take early retirement. *Id.* ¶ 119.  Zahler resisted, but found her

workplace environment to become progressively more and more difficult and hostile.  *Id.* ¶ 119.

Zahler's managers treated her with hostility and undermined the relationships she cultivated with

Empire's customers.  At one point, the CEO of Empire, Loyd Sobel, said to Zahler, "Did you

ever think of another career?"  *Id.* ¶ 69.

      After the 2007 merger, many of Zahler's accounts were redistributed among the

other sales representatives at the company.  *Id.* ¶ 46.  Most of her high-earning accounts (called

"top 3000 accounts") were given to younger male counterparts or to others of a preferred

demographic.  *Id.*  Zahler was left with fewer and lower-earning accounts, effectively reducing

her commissions.  *Id.* ¶ 47.  Zahler's division comprised mostly small, struggling, lower-end

---

[1]      The factual allegations, which are assumed to be true for purposes of deciding this motion, *see Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007), are drawn from the well-pleaded allegations in the Complaint and its incorporated exhibits.

enterprises, which could not generate high-volume sales. *Id.* ¶ 72. Many of these accounts would only place orders "cash in hand" ("CIH") or "cash on delivery" ("COD"); were not yet open for business, did not have a liquor license, or were out of business; had too much stock; or would buy from local liquor stores because they could not afford to buy from a distributor like Empire. *Id.* ¶¶ 50, 71-72; Ex. J. The division was called the Combo Division by the company, but it earned the nickname the "Compost Division" by its sales representatives. *Id.* ¶ 50.

Zahler's employment with Empire was governed by a Collective Bargaining Agreement ("CBA"), which provided that employees could only be discharged for "just cause." *Id.* ¶ 36; Ex. E ¶ 3.2. "Just cause" was defined to include the "[f]ailure to earn commission of at least [$40,000] in a period of 12 months." *Id.* ¶ 36; Ex. E ¶ 3.3. The CBA also imposed a "Quota System," which required Empire employees to meet certain monthly sales quotas. *Id.* ¶¶ 32-35; Ex. D. Under the "Quota Procedure Rules for Assignment," quotas were to be assigned "in a fair and equitable manner," taking into consideration each salesperson's geographic territory, types of accounts and whether such accounts were CIH or COD accounts, among other things. *Id.* An employee was to receive a failing grade for any month in which she did not achieve at least 70% of the highest quota percentage achieved in her sales division. *Id.* Ex. D.

In spite of the strict quota and minimum commission provisions in the CBA, Empire did not strictly enforce failures to meet minimum commissions. *Id.* ¶ 68. In fact, Empire frequently assisted salespersons who fell short of their quotas by giving them additional "house" accounts (accounts that were already up and running and required little effort to service). *Id.* For example, when Anthony Baggio had difficulty making his quotas and draws in the wine division, they gave him a "leg-up" and switched him to the spirits division. *Id.* ¶ 70. However, Empire did not accord Zahler such forgiving treatment. On one occasion, Zahler missed her

Management by Objectives ("MBOs") – a set of goals set by Empire based on the Quota System – by only 79 cents, but Empire still strictly enforced the Quota System against her. *Id.* ¶ 69. The management refused to adjust her quotas to reflect that many of her accounts were out of business or "cash in hand" establishments – despite her repeated complaints and documentation of these accounts through email and photos. *Id.* ¶ 73; Exs. I, J. When Zahler complained that she could not meet her minimum commission requirements with her current account portfolio and pleaded for some stronger house accounts, the management summarily refused her requests, and told her that she first had to improve her existing, weak accounts. *Id.* ¶ 67.

An important part of Zahler's job was to market Empire's products by setting up promotion events with clients. She would set up the promotion, and then Empire was responsible for booking the promotion and providing general support. *Id.* ¶¶ 54-55. Distributing "wearables" – such as branded t-shirts and caps from the supplier – to be worn by waitstaff at restaurants was another important method employed by Empire's sales representative to promote Empire's products. *Id.* ¶¶ 78-79. Zahler's supervisors repeatedly undermined promotions she had arranged and unfairly denied her wearables to distribute, while helping her younger and/or male and/or Irish or Latino counterparts.

Anna Ortega, Zahler's supervisor beginning in early 2008, was a Latina woman who treated Latino salespeople better than Zahler, who is Jewish. *Id.* ¶ 57. For example, Ortega would "wine and dine" the accounts of other salespersons, particularly those of Latinos, but failed to do the same for Zahler. *Id.* On at least two occasions, Zahler requested promotions but they were not properly booked by Ortega, which led to the loss of those accounts. *Id.* ¶ 63. In February 2009, Zahler called Ortega to tell her she had been in an automobile accident and would be late to work. *Id.* ¶ 59. Ortega repeatedly sent Zahler emails, one in bold font,

demanding that Zahler immediately produce accident-related documents, even though it would have been impossible for Zahler to have already received them. *Id.* At another event, which all salespersons were expected to attend, Zahler arrived early and went to the bathroom. *Id.* ¶ 61. When she exited the bathroom, Ortega yelled loudly, "You were late! You were late!" *Id.* Yet when Ortega received a call on her cell phone from a Latino salesperson a few moments later, she said soothingly that he shouldn't worry about coming since he was stuck in traffic. *Id.* In May 2009, Ortega admitted during a meeting with the general manager of the Combo Division that she did not feel comfortable working with Zahler because she was not one of her people. *Id.* ¶ 63.

John Cronin was Zahler's supervisor from 2008 to 2011. *Id.* ¶ 64. Cronin was hostile to Zahler and repeatedly undermined the orders and promotions she arranged, while privileging Zahler's younger male counterparts.

In March of 2010, Zahler went on FMLA leave to take care of her sick father, who was undergoing cardiac surgery. *Id.* ¶¶ 94, 96. On March 24, 2010, while Zahler was on leave, Cronin contacted Zahler and demanded that she produce a survey on one of her accounts. *Id.* ¶ 98. Even though Zahler explained that she had connectivity problems at the hospital that impeded her ability to submit the survey, Cronin repeatedly threatened Zahler with losing the account if she failed to submit it. *Id.* Later that evening, Zahler herself was hospitalized for being suicidal as a result of Cronin's conduct. *Id.* ¶ 99. Zahler returned to work in May 2010. *Id.* ¶ 100.

In late fall 2010, Cronin approved the Zahler's request to requisition drinking glasses from the warehouse for one of Zahler's accounts. *Id.* ¶ 82. Upon arrival at the warehouse, as per the proper procedure, Zahler called Cronin to confirm the approval with an

employee at the warehouse.  *Id.*  Mr. Cronin asked the warehouse employee if the glasses were nice; when the employee confirmed that the glasses were "very nice," Cronin told the employee not to give them to Zahler.  *Id.*

On December 3, 2010, after Zahler received approval from the supplier to take wearables from the warehouse, Cronin told Zahler, "You're not getting any!"  *Id.* ¶ 81. However, Zahler observed numerous boxes at the warehouse, overwhelmingly designated for male employees.  *Id.*

In the winter of 2010-2011, the owner of one of Zahler's best accounts informed Zahler that Cronin had gone in after business hours and tried to take over the account by bringing in wines to sell to the owner.  *Id.* ¶ 83.

In December 2010, the owner of one of Zahler's accounts became verbally abusive to Zahler regarding a $10 service fee, placing Zahler in fear for her safety.  *Id.* ¶ 88.  To diffuse the situation, Zahler gave $10 to the owner.  *Id.*  When Empire learned of the situation, instead of protecting Zahler, it forced Zahler to take a suspension and unpaid leave for a week during January 2011.  *Id.* ¶ 89.

In February 2011, Zahler set up a promotion with Hibiscus Bar and Grill ("Hibiscus"), and received approval from Cronin.  *Id.* ¶ 90.  However, ten days before the promotion, Cronin canceled the promotion, saying the supplier did not feel the restaurant was a "suitable venue" for its product.  *Id.*  However, when Zahler followed up with the supplier, the supplier was shocked the promotion was canceled and told Zahler he had never told Cronin the venue was not suitable.  *Id.*  As a result of this promotion cancelation, Hibiscus refused to place its ordinary order of approximately $8,000, resulting in a loss to Zahler of $400 in commissions. *Id.* ¶ 91.

Also in February 2011, Zahler's quota required her to promote Macallan 12-year Scotch. *Id.* ¶ 80. When Zahler asked Cronin for sample bottles to take to her customers, Cronin informed her there were no bottles left because he had given them to Tom Slattery, a male employee, for his personal use. *Id.* Cronin then handed Zahler an open bottle, which was clearly not fit for a client. *Id.*

In December 2010, Zahler placed an order for a New Year's Eve party at the World's Fair Marina for more than $7,000 dollars, with another order forthcoming in the range of $15,000. *Id.* ¶ 87. The total commission she would have earned was over $1,100. *Id.* However, the orders were voided due to management's failure to ensure proper delivery on December 28, 2010. *Id.* Rather than fixing the problem, as Empire would have for its male employees, the general sales manager simply told Zahler, "That's the way it goes!" *Id.* The manager of World's Fair Marina ended up writing a letter to Empire on March 9, 2011, informing Empire that Zahler was a "Wonderful and Smart sales person, and she did the great job with us Since last 4 years," but that Empire had caused them so much trouble, in particular with the recent New Year's Eve party incident, that they were going to discontinue their business with Empire. *Id.* Ex. L.

On March 11, 2011, Zahler received a letter from Empire with the subject line, "Minimum Commission," informing her that "[o]ver the past 12 month period, January 2010 through February 2011 (excluding March 2010 and April 2010 due to FMLA) you have failed to earn a minimum commission of $40,000. As a result and in accordance with Article 3.3(f) of the Collective Bargaining Agreement, your employment with Empire Merchants is being terminated effective March 18, 2011." *Id.* ¶ 92; Ex. M. Zahler subsequently learned that she was $700 short of meeting the $40,000 minimum commission required. *Id.* ¶ 94.

Zahler petitioned her Union to object to the termination. Although the Union has the exclusive right to pursue arbitration on behalf of an employee, *id.* ¶¶ 111-112, the Union notified Zahler on March 18, 2011, that it would not demand arbitration on her behalf, and recommended that she accept a $10,000 severance in return for a waiver of her rights. *Id.* ¶¶ 93, 113.

At the time of termination, Zahler had worked for Empire (or its predecessor) for over sixteen-and-a-half years. Feldman Dec. (ECF No. 24), Ex. 2. Although she was fully vested in her pension, she could not receive full benefits under her pension unless she worked until age 65 – another ten years away. *Id.* Exs. 2-3. The parties' submissions have not illuminated the precise effect that Zahler's termination had on her pension, but it appears that she is now eligible for only 40% of the pension she would have been entitled to if she had retired at age 65. *Id.* Exs. 2-3.

2.    *Procedural History*

Zahler filed a complaint in this court on July 1, 2011, but did not enumerate any specific causes of action. (ECF No. 1.) On July 22 and July 29, 2011, the U.S. Equal Employment Opportunity Commission ("EEOC") issued right-to-sue letters to Zahler regarding her Title VII and ADEA claims. Compl., Ex. C. On October 3, 2011, Zahler filed her Amended Complaint ("Complaint"), asserting the fourteen causes of action laid out above. (ECF No. 8.) Empire filed this partial motion to dismiss on December 2, 2011. (ECF No. 19.) Oral argument was held on the motion on January 20, 2011.

DISCUSSION

A.      *Standard of Review*

Under the Federal Rules of Civil Procedure, a complaint "must contain . . . a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to state a claim upon which relief can be granted shall be dismissed upon motion of the defendant. *See* Fed. R. Civ. P. 12(b)(6); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110 (2d Cir. 2010).

Under the new pleading standard set out in *Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). While a court should discard any allegations in the complaint that "are no more than conclusions" because they "are not entitled to the assumption of truth," *id.* at 1950, the court should assume that any remaining well-pleaded allegations are true and "then determine whether they plausibly give rise to an entitlement to relief," *id*; *see also Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 59 (2d Cir.), *cert. denied*, 131 S. Ct. 824 (2010).

B.      *Analysis of Claims*

1.      *The Tortious Interference Claims (Sixth, Seventh and Eighth Causes of Action)*

Under New York law, "[t]ortious interference with contract requires [1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424 (1996).

A defendant may also be liable for tortious interference with *prospective* contractual rights. "The liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations. The added element of a definite contract may be a basis for greater protection; but some protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking." Restatement (Second) of Torts § 766. The New York Court of Appeals has explained the spectrum thus:

> [W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior. Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant.

*NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.,* 87 N.Y.2d 614, 621-22 (1996) (internal quotation marks and citations omitted). Thus, the Second Circuit has held that "[t]o state a claim for tortious interference with [non-contractual] business relations under New York law, four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Scutti Enters., LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) (internal quotation omitted).

Zahler has failed to state a claim in any of the three "tortious interference" causes of action she purports to assert: tortious interference with contract; tortious interference with business relations; and tortious interference with prospective economic opportunity. All of these torts – to the extent they are separate torts at all – require a basic three-party structure: A (the

plaintiff) has a contract or relationship with B (a third party) and C (the defendant) interferes by inducing B to breach the contract or cease doing business with A, causing harm to A. *See* Restatement (Second) of Torts § 766. Paradigmatically, the defendant-interferer is the plaintiff's competitor. *See NBT Bancorp,* 87 N.Y.2d 614, 621-22; *Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 190-91 (1980).

Zahler's allegations do not satisfy this basic structure of tortious interference claims. According to Zahler, she negotiated sales orders with Empire's customers on behalf of Empire. Therefore, the sales contracts were between Empire and its customers. Notably, Zahler was not a party to these contracts. Because Zahler, the plaintiff, was not a party to these contracts or business relations, her tortious interference claims must necessarily fail. *See Scutti Enters.*, 322 F.3d at 215 ("[A] central requirement for [a claim for tortious interference with contractual relations] under New York law is the existence of a valid, enforceable contract *between the plaintiff and a third party*." (emphasis added)).

As for the act of interference, Zahler alleges that *Empire itself* intentionally procured *its own breach* of the sales contracts or prospective contracts, by canceling[2] or failing to properly book[3] promotions, failing to provide wearables[4] or samples,[5] or failing to deliver goods as directed.[6] Zahler does not allege that any third party breached the contract – only Empire itself.[7] Under this framing, Empire is alleged to be both B and C at once – that is, *both* the

---

[2]       Hibiscus incident. Compl. ¶ 90.
[3]       Sappony and Cascarino incidents. Compl. ¶ 55 n.8.
[4]       December 3, 2010, incident. Compl. ¶ 81.
[5]       Macallan Scotch incident. Compl. ¶ 80.
[6]       World's Fair Marina incident. Compl. ¶ 87.
[7]       This is why *Navarro v. Fiorita*, 62 N.Y.S.2d 730 (1947), is of no use to Zahler. In that case, the plaintiff-employee sued his manager for intentionally interfering with various export orders obtained by the plaintiff, thereby depriving plaintiff from earning his commissions under his employment contract. *Id.* at 731-32. The court held that the cause of action could lie, because plaintiff's manager was acting outside the scope of his employment, and in fact against the interests of the corporation. *Id.* at 732. Thus, in that case, the corporation and plaintiff were

breaching contract party *and* the outside interferer.  When one party to a contract procures its own breach, that it not a tort – that is simply a breach of contract.

      Zahler attempts to salvage these poorly-conceived claims by arguing in her opposition papers that, although she was not a party to the sales contracts, she was an intended third-party beneficiary of the contracts, because, through a separate contract between herself and Empire, *i.e.*, the CBA, Zahler would receive a commission from the sales.  This repackaging of her claim fails for at least two reasons.  First, Zahler is not an intended third-party beneficiary of the sales contracts.  "Under New York law, only an intended beneficiary of a contract may assert a claim as a third-party beneficiary.  A third party is an intended beneficiary where either (1) no one other than the third party can recover if the promisor breaches the contract or (2) the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party."  *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 162 (S.D.N.Y. 1998) (internal quotation marks and footnotes omitted).  Here, clearly both Empire and its customers could enforce the sales contracts, and Zahler has not alleged any contract language evidencing an intent to permit enforcement by Zahler as an independent third party.  Accordingly, she is not an intended third-party beneficiary.

      Second, even if Zahler were a third-party beneficiary to the sales contracts (and thus, according to Zahler's theory,[8] had standing to sue for potential tortious interference claims), the fact remains that no tortious interference claim has been pled, because the *interferer* and the *breacher* remain the same party – Empire.  Without identifying any outside interferer that

---

the contract parties, and the manager-defendant was the malicious interferer.  *Id.*  Zahler, however, has sued Empire itself – not an individual supervisor that may be distinct from Empire.

[8]     Zahler has provided no legal argument supporting the theory that third-party beneficiaries can sue for intentional interference torts.

induced a contracting party to breach, no claim for tortious interference has been pled, regardless of whether Zahler has standing to sue as an intended third-party beneficiary.

      2.      *The FMLA Claims (Tenth and Eleventh Causes of Action)*

          a.      *Interference*

The FMLA[9] prohibits employers from interfering with their employees' ability to take FMLA leave. *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."). "'Interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b); *see Potenza v. City of NY*, 365 F.3d 165, 167 (2d Cir. 2004)). An employee may bring an interference claim against the employer when "the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) (citing *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)). The employer's intent is irrelevant to an FMLA interference claim. *Id.*

      To state a prima facie claim for interference under the FMLA, the plaintiff must allege: (1) she is an eligible employee; (2) the defendant qualifies as an employer under the FMLA; (3) the plaintiff was entitled to take leave under the FMLA; (4) the plaintiff gave notice

---

      [9]      *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) describes employees' rights under the FMLA:

> The FMLA gives eligible employees an "entitlement" to twelve workweeks per year of unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA provides that at the end of an employee's leave the employee has the right to return to the position he held before the leave or its equivalent, *see* 29 U.S.C. § 2614, though this right is not absolute, *see* 29 C.F.R. § 825.214(b) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA.").

to the defendant of her intention to take leave; and (5) the defendant denied the plaintiff benefits to which she was entitled under the FMLA. *See Brown v. Pension Bds.*, 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007).

Empire contests that Zahler has not alleged the fifth element of her claim – namely, that Zahler was denied benefits to which she was entitled. Zahler admits that her leave request was granted. However, according to the Complaint, on March 24, 2010, while Zahler was on leave, Cronin contacted her and aggressively demanded that she produce an account survey while she was at the hospital caring for her father. Compl. ¶ 98. Even when Zahler explained she had Internet connectivity problems at the hospital that prevented her from submitting the survey, Cronin "repeatedly threatened" Zahler with losing the account if she failed to submit the survey, resulting in Zahler's own hospitalization. *Id.*

Courts have held that "[f]ielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights." *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009). Thus, a few brief, infrequent phone calls to the plaintiff asking where files were saved in the computer and where to find certain things – to which the plaintiff did not object and which did not require the plaintiff to produce any work product, complete any assignments or use her computer – did not constitute interference with FMLA leave. *Id.* Phone calls to an employee recuperating at home without acute distress, "limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments" do not violate the FMLA. *Id.* (citing *Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F. Supp. 2d 886, 910-11 (E.D. Mich. 2007)).

However, Zahler has plausibly alleged facts supporting a greater level of interference than such professional courtesy calls. According to Zahler, Cronin "repeatedly"

demanded that Zahler use her computer to produce work product and send the work product to him. And he persisted in this demand in spite of her explanation that she could not perform the task because she was at that very moment carrying out the primary purpose of her FMLA leave – caring for her debilitated father at the hospital. Indeed, Cronin threatened her with losing the account if she failed to submit the assignment to him. This demand plausibly impeded Zahler's exercise of her rights "in some manner," *Sista*, 445 F.3d at 176, precluding dismissal at this early stage.

      b.    *Retaliation*

The FMLA also prohibits employers from retaliating against their employees for taking FMLA leave. *See* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."). To make out a prima facie case for FMLA retaliation, Zahler must allege that: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Potenza v. City of New York*, 365 F.3d 165 (2d Cir. 2004); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). The Second Circuit recently clarified that "for purposes of the FMLA's anti-retaliation provision, a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his legal rights." *Millea v. Metro-North R.R.*, 658 F.3d 154, 164 (2d Cir. 2011) (adopting for FMLA retaliation claims the standard set forth in *Burlington N. & Sante Fe R.R. v. White*, 548 U.S. 53 (2006)).

Empire disputes the third element of Zahler's claim – that she suffered an adverse employment action. Empire points out that Zahler returned to her employment with Empire on

the same terms and conditions as when she left. Moreover, upon Zahler's request, Zahler was relieved of her May 2010 sales quotas, as well.

The adverse employment action that Zahler relies on in opposition to Empire's motion is the harassing phone call from Cronin on March 24, 2010. Thus, Zahler claims that the same event that constituted interference with her FMLA rights also constituted retaliation for her exercise of those rights. This phone call from Cronin demanding that she complete a survey for one of her accounts – backed by the threat of forfeiting the account, and thus further depleting the base from which she draws her sales commissions – could plausibly constitute a materially adverse employment action under the new *Millea* standard. It is plausible that a reasonable worker in Zahler's position would be dissuaded from exercising her FMLA rights for fear of receiving a harassing and threatening phone call demanding that she complete work product while on leave or face a sanction jeopardizing her job stability. I need not address at this point whether the same conduct by an employer can support claims for both interference and retaliation, for even if it cannot, a plaintiff is free to allege both claims alternatively. *See* Fed. R. Civ. P. 8(d)(2). Because Zahler has stated a plausible materially adverse employment action, and Empire does not contest any other elements of the claim, dismissal of Zahler's FMLA retaliation claim is unwarranted at this stage.

3.      *The ERISA Claim (Fourteenth Cause of Action)*

Section 510 of ERISA provides, in relevant part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such

participant may become entitled under [an employee benefit] plan . . . ." 29 U.S.C. § 1140.[10]  To

prevail on a claim under this statute, the plaintiff must show that her employer "was at least in

part motivated by the specific intent to engage in activity prohibited by § 510."  *Dister v. Cont'l*

*Grp., Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988).  However, "no ERISA cause of action lies where

the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a

termination of employment."  *Id.* (quoting *Titsch v. Reliance Grp., Inc.*, 548 F. Supp. 983, 985

(S.D.N.Y. 1982)).  However, the employer's specific intent is "seldom the subject of direct

proof"; "[e]mployers of a mind to act contrary to law seldom note such a motive in their

employee's personnel dossier."  *Id.* at 1111, 1112.  Therefore, the Second Circuit applies the

*McDonnell Douglas* burden-shifting analysis to determine intent in Section 510 cases.  *Id.* at

1112-13 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)).[11]

      "Where an employee's ERISA claim is based only on a claim that the employee

has been deprived of the opportunity to accrue additional benefits through more years of

employment, a prima facie case requires some additional evidence suggesting that pension

interference might have been a motivating factor."  *Lightfoot v. Union Carbide Corp.*, 110 F.3d

898, 906 (2d Cir. 1997). "[The] Plaintiff is required to prove more than the single fact that his

---

[10]     The provision "was designed primarily to prevent 'unscrupulous employers from discharging or
harassing their employees in order to keep them from obtaining vested pension rights.'"  *Dister v. Cont'l Grp., Inc.*,
859 F.2d 1108, 1111 (2d Cir. 1988) (quoting *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980)).

[11]     The *McDonnell Douglas* burden-shifting analysis, developed in the Title VII context, has been
summarized by the Supreme Court as follows:

> First, the plaintiff has the burden of proving by the preponderance of the
> evidence a prima facie case of discrimination. Second, if the plaintiff succeeds
> in proving the prima facie case, the burden shifts to the defendant "to articulate
> some legitimate, nondiscriminatory reason for the employee's rejection . . . ."
> Third, should the defendant carry this burden, the plaintiff must then have an
> opportunity to prove by a preponderance of the evidence that the legitimate
> reasons offered by the defendant were not its true reasons, but were a pretext for
> discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at
802)).

termination precluded him from vesting into the . . . Plan; he must demonstrate [his employer's] unlawful purpose in firing him."  *Dister*, 859 F.2d at 1111.

Zahler has alleged that Empire engaged in an intentional pattern of age discrimination designed to coerce its employees to retire prior to full vestiture of their pensions. She has also alleged that in 2006 or 2007, she and others were encouraged to take early retirement, and when she did not, her work environment became much less hospitable.  Zahler has also submitted a document attached to a recent declaration evidencing that beginning January 1, 2009, the Union's pension fund was certified to the U.S. Department of the Treasury to be in "endangered status."  (Feldman Dec., Ex. 1.)  This meant that the fund "currently has, or is expected to have, an accumulated funding deficiency," meaning that "the assets available for use by the Fund are less than the minimum required by law."  (*Id.*)  Zahler has also alleged that although Empire enforced the minimum commission requirements flexibly with other employees, it terminated her when she missed the $40,000 minimum commission by a mere $700.  Empire did so when Zahler was 54 years old and roughly ten years away from a substantially handsomer pension.

Zahler will need to substantiate her various allegations with evidence through discovery.  Moreover, Zahler will have a hefty burden of rebutting Empire's asserted reason for discharging her as mere pretext.  However, at this initial pleading stage, where Zahler need only allege facts that render it plausible that Empire was at least partially motivated by an intent to interfere with Zahler's pension rights in terminating her, dismissal of her claim under § 510 of ERISA is inappropriate.

4.      *The Wrongful Termination Claim (Ninth Cause of Action)*

Section 301 of the LMRA provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ." 29 U.S.C. § 185.[12]  The Supreme Court has held that § 301 is a "congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985).  Because of the need for a uniform body of law governing the interpretation of CBAs on a national scale, any "state rule that purports to define the meaning or scope of a term in a contract suit therefore is pre-empted by federal labor law." *Id.* at 210.  As the Supreme Court explained in *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06, 410 (1988):

> [I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles – necessarily uniform throughout the Nation – must be employed to resolve the dispute. . . .
> . . . .
> . . . [Yet] as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

Zahler's purported state common law claim for wrongful termination is "inextricabl[y] intertwined with the CBA and require[s] the court to interpret the terms or legal consequences of breach of the agreement." *Duran v. Jamaica Hosp.*, 216 F. Supp. 2d 63, 69 (E.D.N.Y. 2002) (quotation omitted).  Accordingly, Zahler's claim for wrongful termination is

---

[12]      Although the statute purports to be only jurisdictional, it has been interpreted to confer the power to develop federal law to govern such suits. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957). The Court ruled that § 301 expresses a federal policy that the substantive law to apply in § 301 cases "is federal law, which the courts must fashion from the policy of our national labor laws." *Id.* at 456.

preempted by § 301 of the LMRA and duplicative of her hybrid § 301 claim alleged in her twelfth and thirteenth causes of action.[13]

The case of *Duran v. Jamaica Hospital* is instructive. There, like here, the plaintiff asserted a common law claim for wrongful termination. *Duran*, 216 F. Supp. 2d at 69. Like here, plaintiff's employment was governed by a CBA that permitted termination only for "just cause." *Id.* The court held that "Plaintiff's common law claim requires by the very language of the complaint, that the court interpret the CBA. Because it is undisputed that the CBA controls determination of just cause . . . the court will ultimately have to assess [the CBA] to determine whether Jamaica Hospital had 'justifiable and reasonable cause' to terminate Plaintiff's employment . . . . Assessing the CBA triggers § 301 and causes the federal statute to preempt the state common law claim." *Id.* at 70.

Moreover, as here, the plaintiff in *Duran* tried to avoid this result by arguing that "because the terms of the CBA are unambiguous and would not produce differing opinions, § 301 does not preempt the common law claim in this instance." *Id.* Zahler too has argued that "just cause" and "failure to earn commission of at least [$40,000] in a period of 12 months," are unambiguous and do not require interpretation by the court. The court rejected that argument, saying that "where a CBA is inextricably intertwined with a claim before the court, § 301 presents an a priori bar, not an ad hoc guideline: in such instances, § 301 will preempt state law whenever interpretation of the CBA is required; § 301 does not allow an exception for situations appearing to present relatively uncontroversial interpretations." *Id.*

---

[13]     Indeed, I asked plaintiff's counsel at oral argument to articulate the independent significance of the "wrongful termination" claim asserted in the ninth cause of action, in light of the hybrid § 301 claim asserted in the twelfth and thirteenth causes of action. Counsel was unable to ascribe any independent meaning to the wrongful termination claim, and merely harkened to the CBA breach and the tortious interference claims.

CONCLUSION

Accordingly, Zahler's tortious interference claims (sixth, seventh and eighth causes of action) are hereby dismissed for failure to state a claim. Zahler's claim for wrongful termination (ninth cause of action) is dismissed as well, as it is preempted by § 301 of the LMRA. Zahler's claims for FMLA interference and retaliation (tenth and eleventh causes of action, respectively) and ERISA § 510 (fourteenth cause of action) are not dismissed because I conclude that she has stated a plausible ground for relief on each.

So ordered.

John Gleeson, U.S.D.J.

Dated: January 31, 2012
       Brooklyn, New York